SEP-08-2009 08:38 From:                                    To:94072993937          P.5/33

## CIRCUIT COURT OF SARASOTA COUNTY, FLORIDA
## TWELFTH JUDICIAL CIRCUIT

| | |
|---|---|
| SCOOP REAL ESTATE, L.P.; ) <br> VALHALLA INVESTMENT PARTNERS, L.P.; ) <br> VICTORY IRA FUND, LTD.; ) <br> VICTORY FUND, LTD.; ) <br> VIKING IRA FUND, LLC; and ) <br> VIKING FUND, LLC, through their Court- ) <br> Appointed Receiver, BURTON WIAND, ESQ., ) <br>   ) <br> Plaintiffs, ) <br> vs. ) <br>   ) <br> HOLLAND & KNIGHT LLP; ) <br> SCOTT R. MACLEOD; ) <br> AND JOHN DOE 1-10, ) <br>   ) <br> Defendants ) | CASE NO. 2009-CA-014887-NC |

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs SCOOP REAL ESTATE, L.P.; VALHALLA INVESTMENT PARTNERS, L.P.; VICTORY IRA FUND, LTD.; VICTORY FUND, LTD.; VIKING IRA FUND, LLC; and VIKING FUND, LLC, (all collectively referred to herein as "The Investment Funds" or "The Funds"), through their Court-appointed Receiver BURTON WIAND ("the Receiver"), sue Defendants HOLLAND & KNIGHT LLP and SCOTT R. MACLEOD ("MACLEOD") (collectively "H & K"), and other as-yet unidentified "John Doe" Defendants 1 – 10, and say:

### THE PARTIES, JURISDICTION, AND VENUE

1. SCOOP REAL ESTATE, L.P. ("SCOOP RE") is a Delaware limited partnership. SCOOP RE's General Partner is an entity named Scoop Capital, LLC, a Florida limited liability company, and its investment manager was SCOOP MANAGEMENT, INC. ("SCOOP MANAGEMENT").

2. VALHALLA INVESTMENT PARTNERS, LP ("VALHALLA") is a Delaware revised uniform limited partnership. VALHALLA's General Partner is Valhalla Management, Inc., a Florida corporation, and its investment manager was SCOOP MANAGEMENT.

3. VICTORY IRA FUND, LTD. ("VICTORY IRA") is a Florida limited partnership. VICTORY IRA FUND's General Partner is also Scoop Capital, LLC, and its investment manager was SCOOP MANAGEMENT.

4. VICTORY FUND, LTD. ("VICTORY") is a Florida limited partnership, whose General Partner is also Scoop Capital, LLC, and its investment manager was SCOOP MANAGEMENT.

5. VIKING IRA FUND, LLC ("VIKING IRA") is a Delaware limited liability company qualified to do business in Florida. VIKING IRA's Managing Member is Viking Management, LLC, a Delaware limited liability company qualified to do business in Florida, and its investment manager was SCOOP MANAGEMENT.

6. VIKING FUND, LLC ("VIKING") is a Delaware limited liability company. VIKING's Managing Member is also Viking Management, LLC, and its investment manager was SCOOP MANAGEMENT.

7. At all times relevant to this case, The Investment Funds were all operated out of offices located in Sarasota County, Florida.

8. In January of 2009, it was discovered that The Investment Funds had been the victims of a fraudulent scheme operated by Arthur Nadel ("Nadel") through SCOOP MANAGEMENT, and that nearly all of the money received from investors was gone.

2

9. Upon learning of the fraud perpetrated by Nadel, the U.S. Securities and Exchange Commission initiated an action in the U.S. Federal District Court in Tampa, Florida, and sought the appointment of a Receiver.

10. BURTON WIAND, ESQ., an attorney practicing in Tampa, Florida, was appointed Receiver pursuant to a Federal Court Order dated January 21, 2009, and was granted the full and exclusive power, duty and authority to administer and manage all business affairs and choses in action belonging to The Investment Funds.[1]

11. By further Order of the U.S. District Court, the Receiver has been authorized to retain counsel and pursue the claims asserted in this case.

12. HOLLAND & KNIGHT LLP is a Florida limited liability partnership with its principal place of business in Tampa, Florida.

13. MACLEOD is a partner in HOLLAND & KNIGHT LLP, and he works out of H & K's Orlando, Florida offices.

14. "The Related Entities" (Scoop Capital, LLC, Valhalla Management, Inc., and Viking Management) were formed by Nadel and/or his business associates, including Neil Moody and Chris Moody ("the Moodys"), for the purpose of acting as the General Partner or Managing Member of The Investment Funds and to provide services to The Investment Funds for compensation, including providing day-to-day administrative functions, as well as functions associated with the sale and distribution of investment interests in The Funds.

15. MACLEOD was the H & K partner responsible for legal work done on behalf of The Investment Funds, The Related Entities, and SCOOP MANAGEMENT.

---

[1] That Order was issued by the Hon. Richard Lazzara in Case No. 8:09-cv-87-T-26TBM, styled Securities and Exchange Commission v. Arthur Nadel, et al. (Middle District of Florida).

3

16. All allegations in this Complaint relating to H & K are also to be construed as allegations against MACLEOD, unless otherwise specifically stated.

17. John Doe Defendants 1 – 10 are the other individual H & K lawyers involved in joint representation of The Investment Funds, SCOOP MANAGEMENT and The Related Entities. Their identities are expected to be revealed in the course of discovery, at which time those individuals may be added as additional named defendants. It is believed that these John Doe 1 - 10 defendants, like MACLEOD, worked for H & K.

18. In conjunction with the rendering of legal services to The Investment Funds, SCOOP MANAGEMENT and The Related Entities, H & K's lawyers visited the offices in Sarasota, Florida, where the business of The Investment Funds was conducted, and where SCOOP MANAGEMENT and The Related Entities were officed.

19. Bills for H & K services rendered to The Investment Funds were sent to and paid from offices in Sarasota.

20. This Court has jurisdiction over this cause of action and the parties, and venue is proper in this Court. The events giving rise to this cause of action arise out of legal work the Defendants performed in Florida for The Investment Funds and their related entities, all of which maintained their business offices in Sarasota, Florida. In addition, Nadel's theft of money from The Investment Funds through Nadel's scheme occurred in Sarasota, Florida.

## ALLEGATIONS COMMON TO ALL COUNTS

21. The Investment Funds were a series of unregistered and unregulated entities formed to solicit and gather the money of investors and to invest that money in a variety of investments.

22. The Investment Funds had no employees of their own, and the investment management functions of all of The Investment Funds was conducted by SCOOP

4

MANAGEMENT, a company owned and controlled by Arthur Nadel, and which had its offices in Sarasota County, Florida.

23. The various General Partner and Managing Member entities of The Investment Funds ("The Related Entities") performed sales and administrative functions, but did not generally make the investment decisions for The Funds; those investment decisions were the primary responsibility of Nadel and SCOOP MANAGEMENT.

24. Sometime in 2002 and continuing thereafter, H & K was retained as the attorney for each of The Investment Funds, and did thereafter render legal services to each of The Investment Funds.

25. At the same time it acted as attorneys for each of The Investment Funds, H & K also represented SCOOP MANAGEMENT as well as The Related Entities.

26. H & K was paid for the legal services it rendered to The Investment Funds.

27. Multi-millions of dollars of shares or units in The Investment Funds were sold to the public using H & K-created disclosure documents. In the Receiver's First Interim Report to the Federal Court, the Receiver estimated that 371 investors placed approximately $397 million in The Investment Funds, much of which was stolen or improperly diverted by Nadel. The Receiver's Third Interim Report, filed with the Federal Court on August 17, 2009, is consistent with the First Interim Report.

28. In mid-January 2009, the media first reported that Nadel had been operating The Investment Funds as a fraudulent scheme.

29. Nadel's fraud, theft and diversion of The Investment Funds' assets was spearheaded by Nadel, using his company SCOOP MANAGEMENT, and was unknown to The Investment Funds until January, 2009.

5

30. H & K, as the attorneys for each of The Investment Funds, owed a duty to each of The Funds to protect their respective legal interests.

31. The interests of SCOOP MANAGEMENT, Arthur Nadel, and The Related Entities were in conflict with the interests of The Investment Funds.

32. H & K, in the course of its representation of The Investment Funds, SCOOP MANAGEMENT, and The Related Entities, failed to conduct an adequate due diligence investigation into Nadel, including investigation into the fact that Nadel, a former lawyer, had been disbarred for improperly taking his clients' money from escrow or trust accounts.

33. H & K owed The Investment Fund clients a duty to provide competent legal representation, and failed in this duty by failing to advise The Investment Funds, and related entities, of Nadel's troubled background.

34. The conduct of H & K described in this Complaint was material and resulted in a significant loss to The Investment Funds.

35. The actions and inactions of H & K allowed and/or aided and abetted Nadel's fraudulent and improper activities.

36. In addition to The Related Entities, each Investment Fund through its controlling General Partner or Managing Member entered into an arrangement with SCOOP MANAGEMENT, which was owned and controlled by Arthur Nadel, for the provision of investment advisory and investment management services to each Investment Fund.

37. Nadel and SCOOP MANAGEMENT invested and controlled the majority of money and investments belonging to The Investment Funds.

38. H & K represented and acted as attorneys for each of The Investment Funds and The Related Entities, as well as for Nadel and his solely held company, SCOOP MANAGEMENT.

39. Nadel was, in effect, a "rogue manager" who improperly diverted money from The Investment Funds to himself, SCOOP MANAGEMENT, The Management Entities or others.

40. Nadel maintained a veil of secrecy over the investment activities of himself and SCOOP MANAGEMENT.

41. Nadel made all investment decisions through SCOOP MANAGEMENT, and these investments decisions and actual investment results were confidentially and secretly maintained by him.

42. In fact, Nadel commingled the assets and accounts of all of The Investment Funds with the assets of his own securities trading account, and allocated profits and losses among the various accounts in an after-the-fact, "cherry picking" fashion.

43. Thereafter, Nadel would falsely report the rate of return realized on the supposed investment activities conducted in each of The Investment Funds, and would also announce the ending valuation for the total assets of each investment fund.

44. The rates of return and valuations announced monthly by Nadel were false and bore no relationship to reality.

45. The various fees and charges made to The Investment Funds by SCOOP MANAGEMENT as well as by The Related Entities were based upon the false reports of profits and values that were announced by Nadel.

46. There existed no checks and balances within and among The Investment Funds, SCOOP MANAGEMENT and The Related Entities to provide normal and reasonable assurances that the investment activity and reports of profits and values were true and accurate.

47. In a normal investment fund, there exist numerous checks and balances such as custodians, transfer agents, and others that regularly (usually on a daily basis) balance the accounts of the investment company, the custodian and the brokerage firm against one another. Additionally, there are typically valuation protocols there in place so that the value of the assets actually held by investment companies can be accurately assessed.

48. Also an investment fund usually has an independent certified public accounting firm verify the accuracy of the books and accounts of the fund.

49. None of these normal checks, balances and safeguards were in place for The Investment Funds.

50. In representing the interests of The Investment Funds, H & K should have recommended and insisted on the establishment of these checks, balances and safeguards.

51. The Investment Funds were not fraudulently created in and of themselves.

52. Nadel stole and improperly diverted money from The Investment Funds to the detriment of The Investment Funds.

53. H & K and MACLEOD held themselves out as highly experienced securities counsel who were experts and specialists in the legal, regulatory and customary compliance aspects of the investment fund business.

54. The standard of care owed by and expected from expert, specialized counsel is greater than that which would be expected from an attorney without such specialized expertise.

55. The deficiencies in the operations of The Investment Funds were or should have been well known to H & K.

56. Because H & K acted simultaneously as counsel for The Investment Funds, The Management Entities, and Nadel/SCOOP MANAGEMENT, these multi-levels of representation caused irreconcilable conflicts of interest regarding H & K.

57. H & K knew that numerous conflicts of interest existed between their client, The Investment Funds and their other clients SCOOP MANAGEMENT, Nadel and The Related Entities, but intentionally disregarded those conflicts and proceeded with the simultaneous representation.

58. No waiver of the conflicts of interest that faced H & K was or could be properly acquired, because the conflicts of interest were unwaivable. Moreover, the only persons available to attempt to give a waiver of any conflicts of interest were Arthur Nadel or other principals of The Related Entities, all of whom had conflicts of interest themselves and all of whom were benefiting from fees derived from The Investment Funds. Consequently, there was no independent source from which H & K could receive a valid conflict of interest waiver, and any such waiver that purports to exist is ineffective and a legal nullity.

59. In the 1960's, Nadel was disbarred and prohibited from practicing law by both the State of New York and the Supreme Court of the United States. The reason for Nadel's disbarment concerned his improper use of clients' escrow funds.

9

60. The facts underlying Nadel's conduct and subsequent disbarment by New York and the United States Supreme Court were set forth in publicly reported opinions, which H & K either did or should have discovered.[2]

61. All disclosure documents prepared by H & K stated that Nadel was a law school graduate, but omitted Nadel's disbarment for misappropriating client's escrow money.

62. The information about Nadel's past disbarment was available to H & K, had it exercised reasonable care and diligence in checking into Nadel's background.

63. The information about Nadel's disbarment was material information that should have been furnished to The Investment Funds, and its failure to make that disclosure fell below the legal standard of care required of H & K.

64. H & K's omission of Nadel's disbarment allowed Nadel to be placed in a position of trust from which he perpetuated a massive fraud.

65. H & K either knew, should have known or was reckless in not knowing of Nadel's past conduct in illegally and improperly using money of third parties entrusted to him, and should have recommended and insisted that normal and usual safeguards be put in place, so that a person with a history of improper use of client funds would not be put in unrestricted and unsupervised charge of hundreds of millions of dollars of assets belonging to The Investment Funds.

66. H & K made no recommendations to The Investment Funds that such protocols be put in place but instead remained silent on the subject all the while also representing the interest of Nadel and his company, SCOOP MANAGEMENT.

---

[2] In the Matter of Arthur G. Nadel, 85 A.2d 8, 447 N.Y.S.2d 12 (1982); In the Matter of Disbarment of Arthur G. Nadel, 458 U.S. 1126 (1982) (ordering Nadel to show cause why he should not be disbarred); Id., 459 U.S. 1082 (1982) (ordering the disbarment).

67. As a result of the lack of normal checks and balances being in place, and as a result of allowing Nadel and SCOOP MANAGEMENT to have total, complete and unchecked control of The Investment Funds' assets, Nadel issued false statements to The Investment Funds in violation of §17(a) of the Securities Act of 1933, §10(b) of the Securities and Exchange Act of 1934, and various Exchange Act rules and regulations promulgated thereunder.

68. These actions by Nadel, a known and previously disciplined thief, were foreseeable and preventable had H & K reasonably acted as independent counsel for The Investment Funds.

69. H & K failed to discover that Nadel had been operating a fraudulent investment program, when even a cursory examination and review of his activity would have revealed his illegal activities.

70. H & K failed to conduct any examination or review of Nadel's investment activities or of the protocols and procedures in place concerning the investment activity of Nadel and SCOOP MANAGEMENT, and had H & K conducted any such reasonable examination, Nadel's scheme would have been discovered, halted and damages averted.

71. Nadel was not a registered Investment Advisor, but H & K, as lawyers to The Investment Funds, failed to either advise The Investment Funds or securities regulators that Nadel and/or SCOOP MANAGEMENT were legally required to so register, and were therefore operating illegally as unregistered Investment Advisor(s).

72. H & K prepared disclosure documents which described a person named Michael Zucker as a CPA rendering accounting services to The Investment Funds. Those disclosure documents were prepared by H & K and utilized from a period beginning in late 2002 or early 2003 through a portion of the year of 2006.

11

73. In fact, Mr. Zucker was not a CPA, and he was the subject of an injunctive proceeding by the State of Florida for his improper and continued use of the CPA designation.

74. All of the events concerning Mr. Zucker and the loss of his CPA license occurred several years before H & K's engagement in this matter, and that information was available to H & K, had they sought to ask.

75. The fact that The Investment Funds were utilizing an accountant who was no longer a CPA should have been a red flag to H & K as to the potential of financial improprieties, particularly in light of Nadel's past activities.

76. By 2006, H & K had received information that Mr. Zucker was not in fact a CPA. Rather than investigate further as to what services Mr. Zucker had rendered for The Investment Funds, and whether those services were legitimate, adequate and appropriate, they simply modified the disclosure documents to state that Mr. Zucker was an accountant, and eliminated the CPA designation from further documents.

77. In fact, Mr. Zucker never performed any auditing or similar accounting services to check on the accuracy of the books, records, investment returns or values of the accounts held by The Investment Funds.

78. Even when alerted to the problems concerning The Investment Funds' accountant, H & K took no actions to investigate and made no recommendations concerning proper compliance with normal business practices that would have protected the interests of The Investment Funds and halted Nadel's fraud; instead H & K continued to be the attorneys for The Investment Funds as well as Nadel and SCOOP MANAGEMENT.

79. During the course of the representation of The Investment Funds, H & K received information that the Funds were being illegally sold and marketed and that selling compensation

12

was being illegally and improperly paid to an individual named Donald Rowe and/or various entities that Rowe solely owned and controlled.

80. Knowing that violations of the securities laws had occurred regarding the sales and distribution of shares in The Investment Funds, H & K, rather than reporting the violations to the appropriate authorities and seeking a rescission of the investments on behalf of The Funds and their investors, entered into a "settlement" with Mr. Rowe, whereby he continued to receive improper compensation thinly disguised as "public relations" payments.

81. As with the circumstances concerning Nadel and Mr. Zucker, when H & K was faced with the facts regarding the improper activities of Mr. Rowe, SCOOP MANAGEMENT and The Related Entities, they ignored obligations to their clients, The Investment Funds, and favored the interests of Nadel and SCOOP MANAGEMENT, allowing Nadel's investment program to continue unchecked and unfettered, resulting in multi-millions of dollars of losses.

82. H & K failed in its duty to provide quality and uncompromised legal advice and legal services to The Investment Funds in at least the following manner:

   a. H & K failed to advise and protect The Investment Funds by recommending or structuring proper checks and balances in the operation of the Funds and by allowing Nadel and his company to operate The Investment Funds without the customary checks, balances and oversights routinely employed in the operation of an investment company such as the Funds;

   b. H & K failed to conduct an adequate review of the control and practice in place for The Investment Funds;

   c. H & K was operating with irreconcilable conflicts of interest;

   d. H & K failed to have a system of supervision in place to prevent its lawyers from undertaking the representation of new clients that had conflicts of interest themselves.

   e. H & K failed to exercise due diligence in its preparation of investment disclosure materials prepared for and utilized by The Investment Funds in

13

soliciting investments from the public, and omitted from disclosure material information;

f. H & K failed to advise The Investment Funds that Arthur Nadel was illegally operating as an investment advisor without proper registration; and

g. H & K failed to advise and protect The Investment Funds from being sold through illegal solicitation and sales activities and paying illegal compensation to unregistered brokers and dealers for the Funds, and when directly confronted with these facts, entering into an advising course of conduct to cover up these violations.

83. Additional conflicts and failings of H&K are likely to be uncovered through discovery.

84. H & K, while failing to take proper actions to protect the interests of the Funds and make adequate and appropriate disclosures, charged hundreds of thousands of dollars in legal fees that were paid from The Investment Funds' money.

85. H & K did not protect the interests of its clients, The Investment Funds, but rather it chose to maximize its ability to earn fees from multiple clients who had conflicting interests.

86. The money belonging to The Investment Funds was stolen or improperly diverted by Nadel, and was not properly invested.

87. Nadel's theft and diversion would have been avoided if H & K had done its job in properly representing the interests of The Investment Funds.

88. The delayed discovery doctrine, the continuing violations doctrine, and equitable tolling apply to this cause of action.

89. The activities and breaches of duty by H & K have caused damage to The Investment Funds, including money stolen, improperly diverted, improperly charged as fees, and in paying legal fees for which no value was received.

14

SEP-08-2009 08:48 From: To:94072953937 P.19/33

90. All conditions precedent to the bringing of this cause of action have occurred, or been satisfied or waived.

## COUNT I
### Breach of Fiduciary Duty

91. All prior allegations appearing above Count I of this Complaint are realleged and are incorporated herein by reference.

92. At all times material to the events outlined herein, H & K, as the attorneys for each of The Investment Funds, owed a continuing fiduciary duty to each Fund.

93. The fiduciary duty of H & K required it to act in the best interest of The Funds. H & K breached its fiduciary duty to The Investment Funds when it continued to not act in the best interest of The Investment Funds.

94. As a result of this breach of fiduciary duty, each of The Investment Funds have been damaged.

95. The actions of H & K in breaching its fiduciary duty to each of The Investment Funds was intentional or grossly negligent.

WHEREFORE, the named Plaintiffs herein respectfully request judgment against Defendants for damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems appropriate.

## COUNT II
### Negligence/Professional Malpractice

96. All prior allegations appearing above Count I of this Complaint are realleged and are incorporated herein by reference.

97. H & K and the other Defendants were attorneys employed by The Investment Funds.

15

98. H & K, as The Investment Funds' attorneys, owed but neglected its reasonable duties to The Investment Funds.

99. H & K's conduct as described herein fell below the standard of care expected from independent and experienced counsel.

100. H & K breached the duties it owed to The Investment Funds and committed negligence and/or malpractice, and proximately caused millions of dollars in damage to each of The Investment Funds.

101. H & K's conduct constitutes gross negligence.

WHEREFORE, the named Plaintiffs herein respectfully request judgment against Defendants for damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems appropriate.

### COUNT III
### Common Law Aiding and Abetting of Fraud

102. All prior allegations appearing above Count I are realleged and are incorporated herein by reference.

103. There existed an underlying fraud, namely, Nadel's theft from The Investment Funds.

104. The Defendants had constructive knowledge of the fraud.

105. As set forth above, and incorporated by reference herein, H & K, when faced with information concerning Nadel and SCOOP MANAGEMENT's activities and operations, including the lack of financial controls, the use of an unlicensed "CPA," the improper and illegal selling activities occurring in The Funds and the other matters described herein continually ignored their obligations to The Investment Funds and rendered legal advice which assisted Nadel in the perpetuation of his fraudulent scheme.

16

106. H & K well knew that it had conflicts of interest and intentionally chose to ignore those conflicts and to render legal advice and assistance that aided and abetted Nadel in continuing his fraudulent scheme.

107. In exchange for aiding and turning a blind eye to Nadel's and SCOOP MANAGEMENT's activities, H & K received hundreds of thousands of dollars legal fees.

108. Even if H & K did not have actual knowledge of Nadel's fraud, its conduct in this regard is so outrageous as to constitute constructive knowledge of Nadel's fraudulent practices.

109. H & K cannot avoid the imputation of knowledge because of its gross and outrageous conduct.

110. The Defendants' conduct allowed, aided and abetted Nadel in committing and continuing his fraudulent scheme, all to the detriment and damage to The Investment Funds.

WHEREFORE, the named Plaintiffs herein respectfully request judgment against Defendants for damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems appropriate.

## COUNT IV
### Common Law Aiding and Abetting of Breach of Fiduciary Duty

111. All prior allegations appearing above Count I are realleged and are incorporated herein by reference.

112. SCOOP MANAGEMENT and Nadel both owed a fiduciary duty to The Investment Funds.

113. SCOOP MANAGEMENT and Nadel breached their fiduciary duties owed to The Investment Funds.

17

SEP-08-2009 08:41 From: To:94072953937 P.22/33

114. H & K knew, should have known or was reckless in not knowing the Nadel and SCOOP MANAGEMENT were operating in a manner that breached their fiduciary duties to The Investment Funds.

115. As set forth above, and incorporated by reference herein, H & K, when faced with information concerning Nadel and SCOOP MANAGEMENT's activities and operations, including the lack of financial controls, the use of an unlicensed "CPA," the improper and illegal selling activities occurring in The Funds and the other matters described herein continually ignored its obligations to The Investment Funds and rendered legal advice which assisted Nadel in the perpetuation of his fraudulent scheme.

116. H & K well knew that it had conflicts of interest and intentionally chose to ignore those conflicts and to render legal advice and assistance that aided and abetted Nadel in continuing his fraudulent scheme.

117. In exchange for aiding and turning a blind eye to Nadel's and SCOOP MANAGEMENT's activities, H & K received hundreds of thousands of dollars legal fees.

118. Even if H & K did not have actual knowledge of Nadel's fraud, its conduct in this regard is so outrageous as to constitute constructive knowledge of Nadel's fraudulent practices.

119. H & K cannot avoid the imputation of knowledge because of its gross and outrageous conduct.

120. The Defendants' conduct allowed, aided and abetted Nadel in committing and continuing his fraudulent scheme, all to the detriment and damage to The Investment Funds.

WHEREFORE, the named Plaintiffs herein respectfully request judgment against Defendants for damages, prejudgment interest, attorneys' fees, the costs of this action, and such other and further relief this Court deems appropriate.

18

## NOTICE OF INTENTION TO SEEK PUNITIVE DAMAGES

The actions of H & K as described in this Complaint were intentional and/or grossly negligent and entitle the Plaintiffs to seek punitive damages. Notice is hereby given that the Plaintiffs will, at the appropriate time, request the Court to include a claim for punitive damages in this case pursuant to the procedures established in Florida Statute 768.22.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

Guy M. Burns
guyb@jpfirm.com
Florida Bar No. 0160901
Jonathan S. Coleman
jonathanc@jpfirm.com
Florida Bar No. 797480
JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP
P.O. Box 1100
Tampa, FL 33601-1100
Telephone: (813) 225-2500
Facsimile: (813) 223-7118
Counsel for Plaintiffs

#130690

19